711 F.2d 521
 McDOWELL-WELLMAN ENGINEERING COMPANY, Appellant,
v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY and Lexington
Insurance Company and Rollins, Burdick and Hunter
of Pennsylvania, Inc., Appellees.
 No. 82-1630.
 United States Court of Appeals,
Third Circuit.
 Argued April 14, 1983.
Decided June 30, 1983.
 
 John C. McNamara (argued), German, Gallagher & Murtagh, Philadelphia, Pa., for appellant.
 Charles W. Craven (argued), Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for Lexington Ins. Co.
 Mark D. Alspach (argued), Krusen Evans & Byrne, Philadelphia, Pa., for Hartford Acc. and Indem. Co.
 Before HUNTER and WEIS, Circuit Judges, and GERRY,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 In April of 1974, Alan Wood Steel Company ("Alan Wood") filed suit against McDowell-Wellman Engineering Company ("McDowell")[1] for damages allegedly arising from the collapse of an ore bridge constructed by McDowell at Alan Wood's Conshohocken, Pennsylvania steel-producing facility. In October of 1975, McDowell instituted this action against Hartford Accident and Indemnity Company ("Hartford") and Lexington Insurance Company ("Lexington") seeking a declaratory adjudication of coverage for Alan Wood's claims under two insurance policies issued to McDowell by Hartford and Lexington respectively. McDowell settled its case with Alan Wood for $600,000 and amended its complaint against Hartford and Lexington to seek recovery in that amount from the two insurance companies. Following a bench trial the district court issued a Memorandum and Order holding Hartford, the primary insurance carrier, liable for $9,240. It held Lexington, the excess insurance carrier, relieved of all liability. McDowell appeals the district court's ruling. We will affirm.
 
 
 2
 * On September 15, 1971, Hartford issued to McDowell a comprehensive general liability insurance policy (the "Hartford policy"). That policy provided that Hartford would pay for any damages that McDowell became legally obligated to pay because of bodily injury or property damage covered by the policy and caused by an "occurrence."[2] Coverage under the Hartford policy was limited to $500,000. Lexington had earlier issued an umbrella liability insurance policy (the "Lexington policy") to McDowell. The Lexington policy indemnified McDowell for ultimate net loss in excess of any coverage provided by McDowell's primary liability insurance policy. Coverage under the Lexington policy was limited to $100,000. It is not disputed by the parties that both the Hartford and the Lexington policies were in force at all times relevant to this litigation. The parties have agreed that if the Hartford policy provides coverage for Alan Wood's claims the Lexington policy provides coverage as well. See app. at 352a.
 
 
 3
 The dispute in this case involves an ore bridge originally built in 1957 by McDowell at Alan Wood's steel manufacturing plant. The ore bridge extended over a large pit in which raw materials used in the manufacture of steel were stored. The bridge consisted of a steel superstructure supported by legs attached to railroad cars which ran along either side of the pit. The railroad cars allowed the bridge to be moved up and down the length of the pit. Attached to the bottom of bridge was a movable crane which was used to pick up raw materials stored in the pit. The entire bridge could then be moved to the end of the pit where two blast furnaces were located, and the raw materials carried by the crane could be dumped into railroad cars which would take them into the furnaces.
 
 
 4
 On November 20, 1971, the ore bridge collapsed. In April of 1974, Alan Wood brought suit against McDowell in federal district court claiming damages arising from that collapse and from the subsequent repair and replacement of the bridge. Alan Wood itemized its damages as follows:
 
 
 5
 Repair and replacement of
 ore bridge $1,342,798
Repair and replacement of
 hydraulic building and trestle[3] 35,678
---------------

3 The hydraulic building was a small building near the blast furnace that
contained pumping equipment. The trestle was the structure over which
railroad cars were automatically fed into the blast furnace. Both the
hydraulic building and the trestle were physically damaged when the ore
bridge collapsed.
Business interruption loss in
 the nature of the incurrence
 of additional costs to maintain
 production and shipping levels
 thereby detracting from taxable
 income due to less product
 contribution to profit[4] 929,762
4 Alan Wood broke down its claim for business interruption loss as follows:
1) the cost of renting front-end loaders and bulldozers to move the iron from
ore stock piles to the blast furnaces, $840,720; 2) the cost of storing iron
ore at rented facilities, $36,705; 3) the cost of screening iron ore before
its introduction into the blast furnaces, $56,000; 4) the cost of replacing
sinter with iron ore pellets, $24,460; 5) the cost of employing extra train
crews, $40,819; 6) the cost of a study relating to the collapse of the
bridge, $47,389; and 7) other miscellaneous costs, $23,261. See app. at 125a,
159a. From those costs Alan Wood subtracted $139,992 in cost savings for
non-operation of the ore bridge, leaving a net damage figure of $929,762. See
app. at 125a"26a.
 -------------------------------
 $2,308,238
 
 
 
 [3]
 ,[4]
 
 
 
 6
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEApp. at 123a-24a. McDowell timely notified Hartford of the Alan Wood complaint, and Hartford agreed to defend the action while expressly reserving its right to assert certain policy exclusions. Hartford suggested that McDowell retain its own counsel to protect the uncovered aspects of Alan Wood's claims.
 
 
 7
 On October 7, 1975, McDowell filed this diversity action against Hartford seeking a declaratory judgment that the Hartford policy covered the damages claimed by Alan Wood in its suit against McDowell. On November 24, 1976, McDowell filed an amended complaint adding Lexington as a defendant seeking the same relief under the Lexington policy.
 
 
 8
 In October of 1977, Alan Wood indicated a willingness to settle its claims against McDowell. McDowell made demand upon both insurers to pay their policy limit toward the proposed settlement, but both companies refused. Alan Wood and McDowell then entered into a settlement agreement under which McDowell agreed to pay Alan Wood $600,000 in complete settlement of Alan Wood's claims. That agreement did not allocate monies to any specific damages claimed by Alan Wood. McDowell then filed a second amended complaint against Hartford and Lexington in which McDowell sought to recover the $600,000 it had paid to Alan Wood plus interest and attorneys' fees.
 
 
 9
 The parties agreed to submit the case to the district court on proposed findings of fact and conclusions of law with McDowell reserving the right to call one witness. In the stipulation of uncontested facts,[5] McDowell conceded that under exclusion (1) of the Hartford policy, there was no coverage for the costs of repair and replacement of the ore bridge. App. at 124a. For its part Hartford admitted coverage for the $35,768 claimed by Alan Wood for repair and replacement of the hydraulic building and the trestle. Id. Hartford claimed, however, and the district court agreed, that that amount should be prorated to $9,240 based upon the percentage of the entire claim actually covered by the policy. App. at 361a-62a.[6] As to the $929,726 claimed by Alan Wood as business interruption loss, the district court held that that claim actually represented lost profits and revenues arising from the loss of use of the ore bridge and thus was not covered by Hartford's policy. App. at 358a-61a. Accordingly the district court held that McDowell was entitled to recover a total of $9,240 from its primary insurance carrier Hartford. Because that amount was less than the policy limit of the Hartford policy, the district court held that Lexington, as the excess insurance carrier, was not liable for any damages.
 
 II
 
 10
 Initially we note that as a federal court sitting in diversity we must apply state law to determine the scope of coverage under the Hartford policy. See Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Safeco Insurance Co. v. Wetherill, 622 F.2d 685, 687 (3d Cir.1980). Applying Pennsylvania choice of law rules, see Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the district court held that Ohio law should be applied in this case. App. at 357a. Neither party disputes that determination. Under Ohio law "[a] contract of insurance prepared and phrased by the insurer is to be construed liberally in favor of the insured and strictly against the insurer, where the meaning of the language is doubtful, uncertain, or ambiguous." Moorman v. Prudential Insurance Co., 4 Ohio St.3d 20, 22, 445 N.E.2d 1122, 1124 (1983) (emphasis in original) (quoting Munchick v. Fidelity & Casualty Co., 2 Ohio St.2d 303, 305, 209 N.E.2d 167, 169 (1965)); accord Gomolka v. State Automobile Mutual Insurance Co., 70 Ohio St.2d 166, 168, 436 N.E.2d 1347, 1348 (1982). In addition, "[w]here exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof." Moorman, 4 Ohio St.2d at 22, 445 N.E.2d at 1124; Home Indemnity Co. v. Village of Plymouth, 146 Ohio St. 96, 101, 64 N.E.2d 248, 250 (1945). Determination of the proper coverage of an insurance contract when the facts are undisputed is a question of law. See Gomolka, 70 Ohio St.2d at 167, 436 N.E.2d at 1348.
 
 
 11
 * McDowell contends that the district court erred in holding that the $929,762 claimed by Alan Wood as business interruption loss was not covered by the Hartford policy. That amount represents Alan Wood's extra expenses of handling, storing, and screening raw materials used in its blast furnace after the collapse of the bridge. As we understand it, McDowell makes two slightly different arguments why those damages are covered by the policy. First, it asserts that they represent the diminution of value in Alan Wood's steel making facility after the collapse of the bridge and thus constitute "damages because of ... property damage " under the policy. Second, it argues that they represent the costs incurred by Alan Wood to avoid the loss of use of its blast furnaces and thus constitute "damages for loss of use of property resulting from property damage". Relying principally on Sola Basic Industries, Inc. v. United States Fidelity & Guaranty Co., 90 Wis.2d 641, 280 N.W.2d 211 (1979), and American Motorists Insurance Co. v. Trane Co., 544 F.Supp. 669 (W.D.Wis.1982), McDowell contends that under either argument, Alan Wood's claims fall within the coverage provided by the Hartford policy.
 
 
 12
 McDowell's first argument is based on the Hartford policy's basic insuring language and the policy's definition of property damage as "injury to or destruction of tangible property." McDowell asserts that property damage has occurred in that the collapse of the ore bridge was injury to or destruction of tangible property. That property damage caused damage to other property owned by Alan Wood, specifically its steel producing blast furnaces. Although the two blast furnaces were not physically damaged by the collapse of the bridge, McDowell claims that they were damaged in that they suffered a diminution in value. McDowell claims that such intangible injuries are recoverable damages under the Hartford policy. See, e.g., Sola Basic Industries, 90 Wis.2d at 653-54, 280 N.W.2d at 217; American Motorists Insurance, 544 F.Supp. at 682.[7]
 
 
 13
 The district court concluded that McDowell's argument was unpersuasive, however, because "there is not evidence of record to support [McDowell's] allegation that there was any diminution in value (presumably market value) of Alan Wood's Conshohocken facility as a result of the collapse of the ore bridge." App. at 359a. None of Alan Wood's itemized damage claims were for the loss of market value of its furnaces. McDowell's only witness, a lawyer representing Alan Wood, stated in general terms that when the ore bridge collapsed the blast furnaces were damaged "to the extent that you couldn't use [them] unless you found some other means besides the ore bridge of getting materials to the blast furnace[s]." App. at 345a-46a. He provided no testimony, however, concerning any specific loss of value to any of Alan Wood's facility. No other evidence was presented to the district court which quantified any loss in value of the plant. Other courts, when presented with no record evidence that property was diminished in value because of injury to other tangible property, have refused to allow recovery under language identical to that in the Hartford policy. E.g., Yakima Cement Products Co. v. Great American Insurance Co., 93 Wash.2d 210, 218, 608 P.2d 254, 258-59 (1980). Accordingly, on this record, we reject McDowell's argument that Alan Wood's claim for business interruption loss represents the diminution in value of Alan Wood's steel-making facility and is thus under the Hartford policy.
 
 
 14
 McDowell's second argument is based on the Hartford policy's definition of damages as including "damages for loss of use of property resulting from property damage." McDowell asserts that Alan Wood's claim for business interruption loss actually represents the loss of use of its blast furnaces caused by the collapse of the bridge. The obvious difficulty with that argument, however, is the district court's finding that "the collapse of the ore bridge [did not] prevent the continued use of the blast furnaces or impair their capacity to produce steel." App. at 358a-59a. The district court specifically distinguished the case relied on by McDowell which allowed coverage for damages resulting from the loss of use of property.
 
 
 15
 The case relied on by plaintiff, Sola Basic Industries v. United States Fidelity and Guaranty Company, 90 Wis.2d 641, 280 N.W.2d 211 (Wis.1979), can be distinguished on the facts and does not require a different result here. Sola had sold a transformer to Thunder Bay Manufacturing Company for use in manufacturing steel in the latter's furnaces. While attempting to repair the transformer a Sola employee damaged the transformer requiring that it be removed and rebuilt. The critical difference between Sola and the instant matter is that in Sola removing the transformer rendered Thunder Bay's furnaces inoperable until the transformer was replaced. Here the collapse of the ore bridge did not so affect Alan Wood's blast furnaces which not only remained operable but actually continued to be operated by Alan Wood without interruption.
 
 
 16
 App. at 361a.
 
 
 17
 McDowell argues, however, that when the ore bridge collapsed Alan Wood was faced with a difficult choice: either shut down its blast furnaces or incur extra expenses to find an alternative means of moving its raw materials. McDowell argues that Alan Wood chose the latter and that the extra expenses it incurred represent the loss of use of its blast furnaces Alan Wood would have incurred if it had not moved the raw materials by other means.
 
 
 18
 We disagree. We think the district court was correct in holding that Alan Wood's claim for business interruption loss does not reflect the loss of use of the blast furnaces but rather the loss of use of the ore bridge. Alan Wood's itemized damages are merely the expenses it incurred to obtain an alternative means of storing and moving raw materials after the bridge collapsed. McDowell concedes that the bridge itself is excluded from coverage by the terms of the Hartford policy. Because coverage under the policy applies only to "damages because of ... property damage to which this insurance applies," we conclude that loss-of-use damages for the ore bridge are not covered by the policy as well. Hardware Mutual Casualty Co. v. Mason-Moore-Tracy, Inc., 194 F.2d 173, 176 (2d Cir.1952); Employers Casualty Co. v. Brown-McKee, Inc., 430 S.W.2d 21, 27 (Tex.Civ.App.1968).
 
 
 19
 Accordingly, we will affirm the district court's holding that Alan Wood's claim of $929,762 for business interruption loss is outside the coverage of the Hartford policy.
 
 B
 
 20
 McDowell contends that the district court also erred in prorating the $35,678 in damages concededly covered by the Hartford policy when it determined Hartford's liability for the settlement entered into by McDowell and Alan Wood. McDowell argues that although Hartford and Lexington were informed of its settlement negotiations with Alan Wood, when it demanded that they tender their respective policy limits toward the settlement, both companies refused. McDowell argues that that refusal was a breach of Hartford's and Lexington's insurance contracts, and thus it was improper for the district court to prorate the $600,000 McDowell paid to Alan Wood in settlement of Alan Wood's claims.
 
 
 21
 By offering to defend the Alan Wood litigation while expressly reserving its right to assert any applicable exclusions under the insurance policies, see app. at 154a-55a, neither Hartford nor Lexington breached its duty to defend McDowell against Alan Wood's claims. Motorists Mutual Insurance Co. v. Trainor, 33 Ohio St.2d 41, 44-46, 294 N.E.2d 874, 877 (1973). McDowell appears to argue, however, that Hartford and Lexington breached a separate duty, a duty to pay over their respective policy limits when Alan Wood offered to settle. The Ohio courts have recognized that an insurer owes a duty to exercise good faith in seeking to settle claims against an insured. Centennial Insurance Co. v. Liberty Mutual Insurance Co., 62 Ohio St.2d 221, 222, 404 N.E.2d 759, 761 (1980); Spitler v. State Auto Mutual, Inc., 61 Ohio St.2d 242, 244, 400 N.E.2d 889, 891 (1980); Wasserman v. Buckeye Union Casualty Co., 32 Ohio St.2d 69, 72-73, 290 N.E.2d 837, 839-40 (1972); see Carter v. Pioneer Mutual Casualty Co., 67 Ohio St.2d 146, 423 N.E.2d 188 (1981). See generally Wolfe v. Continental Casualty Co., 647 F.2d 705, 708-09 (6th Cir.1981); R. Long, supra note 7, §§ 5.19-5.36; 44 Am.Jur.2d Insurance §§ 1399-1404 (1982); Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136 (1954). We do not think, however, that McDowell has established that either Hartford or Lexington breached that duty in this case.
 
 
 22
 In discussing the duty owed by an insurer when presented with the possibility of settlement, the Ohio Supreme Court has stated:
 
 
 23
 A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.
 
 
 24
 Centennial Insurance Co., 62 Ohio St.2d at 224, 404 N.E.2d at 762; Slater v. Motorists Mutual Insurance Co., 174 Ohio St. 148, 151, 187 N.E.2d 45, 48 (1962). Under that standard an insurance company must fraudulently and dishonestly decide not to settle in order to breach its duty to the insured. See Slater, 174 Ohio St. at 151, 187 N.E.2d at 48. In its second amended complaint McDowell alleged that when informed of Alan Wood's offer, both Hartford and Lexington indicated some willingness to contribute toward a settlement. Second Amended Complaint pp 14, 23, app. at 7a-8a. The parties' stipulated facts state only that when McDowell demanded that each insurer pay its full respective policy limits, each refused. App. at 126a. We must agree with the district court that those facts alone do not establish a "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." Centennial Insurance Co. 62 Ohio St.2d at 224, 404 N.E.2d at 762; Hart v. Republic Mutual Insurance Co., 152 Ohio St. 185, 188-89, 87 N.E.2d 347, 349-50 (1949); see A. Windt, Insurance Claims and Disputes § 5.10 (1982).[8] Accordingly it was proper for the district court to apportion Hartford's liability for the settlement where no evidence existed that McDowell and Alan Wood allocated the $600,000 to cover certain damages, see R. Long, supra note 7, § 5.73. See C. Raymond Davis & Sons, Inc. v. Liberty Mutual Insurance Co., 467 F.Supp. 17, 21 (E.D.Pa.1979); Alabama Farm Bureau Mutual Casualty Insurance Co. v. Moore, 349 So.2d 1113, 1116 (Ala.1977).[9] We thus affirm the district court's holding that Hartford is liable for only $9,240. Because that amount is less than the policy limit of the Hartford policy, Lexington, as the excess insurance carrier, is relieved of any liability to McDowell.
 
 C
 
 25
 McDowell's final contention on appeal is that it should be awarded prejudgment interest on Hartford's liability under the insurance policy. To determine whether prejudgment interest is appropriate in this case, we must apply state law. Jarvis v. Johnson, 668 F.2d 740, 746 (3d Cir.1982). Under Ohio law interest begins to accrue on a judgment arising from a disputed insurance claim from the time that the loss is deemed payable by the terms of the insurance policy. Royal Crown Plastics & Sales, Inc. v. Motorists Mutual Insurance Co., 51 Ohio App.2d 79, 81, 366 N.E.2d 294, 295 (1976); Amatullis, Inc. v. Great Central Insurance Co., 36 Ohio App.2d 106, 302 N.E.2d 892 (1971); see Nationwide Life Insurance Co. v. Myers, 67 Ohio App.2d 98, 425 N.E.2d 952 (1980). Interest may be paid on an unliquidated claim where the "amount of loss can be ascertained by 'mere computation or is subject to reasonably certain calculations by reference to well-established market values.' " Royal Crown Plastics, 51 Ohio App.2d at 82, 366 N.E.2d at 295-96 (quoting McKinney v. White Sewing Machine Corp., 200 N.E.2d 596, 600 (Ohio Ct.App.1964)).
 
 
 26
 The Hartford policy states, "[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies." App. at 17a. McDowell became legally obligated to pay Alan Wood for damages arising from the ore bridge collapse on November 23, 1977, the date of settlement. At that time Hartford had conceded coverage under its policy for damages to the hydraulic building and trestle. Thus on that date it was possible to calculate with reasonable certainty that Hartford was liable to McDowell for at least $9,240, the apportioned amount of damages covered by the policy. Accordingly we hold that McDowell should receive prejudgment interest from Hartford on that amount. See American Enka Co. v. Wicaco Machine Corp., 686 F.2d 1050, 1056-57 (3d Cir.1982).
 
 III
 
 27
 We will affirm the district court's order of September 3, 1982, entered in favor of McDowell against Hartford in the amount of $9,240. We will remand this case to the district court with instructions to award McDowell appropriate prejudgment interest on that amount.
 
 
 28
 WEIS, Circuit Judge, concurring and dissenting.
 
 
 29
 Although I join parts I, IIB, and IIC of the majority opinion, I must dissent from the result reached in part IIA. In my view, the expenses claimed as business interruption loss are within the coverage of the policy and not barred by the clause excluding the insured's products.
 
 
 30
 Alan Wood claimed damages from McDowell for injuries to the steel plant. These injuries may be subdivided into three general categories--the physical damage to the ore bridge, the physical injury to the hydraulic building and trestle, and at issue here, the intangible injury to the steel plant as a whole.
 
 
 31
 McDowell concedes that the policy does not provide coverage for the physical damage to the ore bridge because of the product exclusion clause. Hartford admits that it must pay for the damage to the hydraulic building and trestle. The insurer makes this concession even though the ore bridge, which is within the exclusion, directly caused the damage to these structures. Thus, even though it is not required to pay the cost of repairing the ore bridge, Hartford does not deny its responsibility to pay for damages directly caused by the collapse of the bridge.
 
 
 32
 The majority and I agree that the term "property damage" as used in this policy "does not require actual physical damage but can include intangible damage such as the diminution in value of tangible property." Maj.Op. at 525 n. 7. The Supreme Court of Wisconsin reached a similar conclusion in Sola Basic Industries v. United States Fidelity & Guaranty Co., 90 Wis.2d 641, 280 N.W.2d 211 (1979). The court, interpreting the same insurance clauses at issue here, held that there was property damage when tangible property is diminished in value or "made useless." Id. at 653, 280 N.W.2d at 217; see also W. Obrist, "The New Comprehensive General Liability Insurance Policy: A Coverage Analysis" 7 (Defense Research Institute Monograph 1966) ("The National Bureau [of Casualty Underwriters] states that the policy ... applies even though the tangible property is not physically damaged but is made useless by the act of an insured.")
 
 
 33
 In this case, the furnaces became useless as steel production facilities for two reasons. First, there was the immediate impact of debris from the bridge preventing the use of one furnace for ten days. In the longer range, neither furnace could produce steel unless supplied with the raw materials formerly delivered by the ore bridge. To the extent that steel could not be produced, the economic value of the plant was reduced. There is no need for expert testimony to establish that an inoperable plant is not as valuable as a functional one.
 
 
 34
 The steel company met its duty to mitigate loss and avert further harm by continuing production through the use of another, but more expensive, method of supplying materials to the furnaces. The economic value of the steel-making plant was thus maintained and significant loss of use damages averted, but at a cost sought as a business interruption loss. Hartford has not disputed the reasonableness of this expense; nor has it asserted that the reduction in value of the plant after the bridge collapsed was less than the amount expended by the steel company.
 
 
 35
 The policy at issue covers damages for diminution in value and loss of use of the steel plant. It follows necessarily that the cost of mitigating or averting such damages is also covered. It can be contended that the economic value of the plant was restored upon the repair of the bridge and that the furnaces were in fact used while the bridge was inoperable. That argument, however, does not address the cost of preventing the intangible damage to the plant that was certain to occur but for the remedial measures taken.
 
 
 36
 This case is similar to Sola Basic Industries, supra, where a transformer negligently maintained by the insured had to be removed for repairs from a manufacturing plant. As a result, the machinery in the plant became "useless" and the manufacturer was required to incur additional expense in order to continue operations. The court found that the liability insurance carrier was liable for these added costs despite an exclusion identical to the one in the case at hand.
 
 
 37
 Hartford arrives at its position by interpreting the claim as if it were for loss of use of the ore bridge. This narrow approach is not required by the policy language. Nor does it square with the purpose underlying the policy and the exclusion at issue, namely, the protection of the insured against harm whose "happenstance and extent ... is entirely unpredictable," Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, ---, 405 A.2d 788, 792 (1979). The damage claim of the steel company is much broader than the characterization adopted by the insurer. The claim is for loss of use of the plant itself, and the measure of damage is the expenditure to avert that loss. Since Hartford is liable for the loss of use of the plant, surely it is responsible for the smaller sum spent to avoid that expense.
 
 
 38
 In Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982), an insured that had negligently repaired a turbine in a ship was held responsible for loss of use of the vessel. In turn, the insurance carrier was required to indemnify the insured despite an exclusion similar to the one at issue here. The court held that "since the [ship] is indisputedly property other than the insured work product, any damages attributable to its 'down time' are not [within the exclusion]." Id. at 423. Similarly, the steel plant in the case at hand faced the prospect of "down time." Expenses to eliminate that loss are within the coverage of the policy because, as in Todd Shipyards, they relate to property other than the insured's product.
 
 
 39
 We should not distort the language of a policy to find coverage, but when the wording is ambiguous it must be construed against the carrier that drafted it. Applying that basic rule of construction, I would enter judgment in favor of the plaintiff on the claim for indemnification on the business interruption loss.
 
 
 40
 * Hon. John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation.
 
 
 41
 1 McDowell-Wellman Engineering Company changed its corporate name to R.C.M. Engineering Company in 1977.
 
 
 42
 2 The basic insuring language of the Hartford policy provides in relevant part:
 
 
 43
 The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
 
 Coverage A--bodily injury or
 Coverage B--property damage
 
 44
 to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
 
 
 45
 App. at 17a. The following terms are defined within the policy:
 
 
 46
 "[D]amages" includes damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage.
 
 
 47
 "[P]roperty damage" means injury to or destruction of tangible property.
 
 
 48
 "[O]ccurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.
 
 
 49
 "[N]amed insured's products" means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name ....
 
 
 50
 App. at 22a. The Hartford policy also contained, inter alia, the following exclusion:
 
 Exclusions
 This insurance does not apply:
 
 51
 * * *
 
 
 52
 (1) to property damage to the named insured's products arising out of such products or any part of such products;
 
 
 53
 App. at 17a.
 
 
 54
 5 Neither party disputed that the collapse of the ore bridge was an occurrence under the Hartford policy. See Grand River Lime Co. v. Ohio Casualty Ins. Co., 32 Ohio App.2d 178, 183-85, 289 N.E.2d 360, 365 (1972).
 
 
 55
 6 The district court divided $35,768 by $2,308,238 to determine what percentage those damages were of the entire amount of damages sought by Alan Wood. The district court then multiplied that percentage by $600,000 to determine what part of the settlement figure represented damages covered by the Hartford policy. App. at 362a.
 
 
 56
 7 The only case we have found construing similar language under Ohio law is the Seventh Circuit's decision in Hamilton Die Cast, Inc. v. United States Fidelity and Guar. Co., 508 F.2d 417 (7th Cir.1975). In that case a tennis racket manufacturer sued its supplier of tennis racket frames when the frames the supplier provided proved to be defective. The manufacturer claimed that it had suffered damages because of the loss of its reputation in the business community and because it had to refund the price of the defective rackets. The court held that the supplier's insurance contract did not cover the manufacturer's claims because those claims did not represent physical damage to the final product, the racket. Id. at 419-20. Hartford cites Hamilton Die for the proposition that only physical damage to tangible property is covered under the insuring language of the Hartford policy.
 
 
 57
 Recent state court decisions, however, reflect a majority view that the term property damage does not require actual physical damage but can include intangible damage such as the diminution in value of tangible property. See, e.g., Sola Basic Indus., 90 Wis.2d at 653-54, 280 N.W.2d at 217; Pittway Corp. v. American Motorists Ins. Co., 56 Ill.App.3d 338, 342, 13 Ill.Dec. 244, 370 N.E.2d 1271, 1274 (1977) (citing cases); cf. Wyoming Sawmills, Inc. v. Transp. Ins. Co., 282 Or. 401, 406, 578 P.2d 1253, 1256 (1978) (no coverage where policy defines property damage as "physical injury to ... tangible property") . See generally R. Long, The Law of Liability Insurance § 11.09 (1982). Because we have found no Ohio state court decisions directly on point and because of our obligation to construe ambiguities in insurance contracts against the insurer, we decline to follow the Seventh Circuit's decision in Hamilton Die that only physical damage is recoverable. Instead we think those decisions that hold that the term "property damage" includes intangible injury to tangible property more likely predict how the Ohio courts would rule on this issue. See McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 662-63 (3d Cir.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).
 
 
 58
 8 The Ohio Supreme Court has stated that even in the event of known liability on the part of the insurer, a decision not to settle is alone legally insufficient to support a finding of bad faith. Centennial Ins. Co., 62 Ohio St.2d at 225 n. 4, 404 N.E.2d at 763 n. 4.
 
 
 59
 9 We also note that Condition 4(c) of the Hartford policy states: "The insured shall not, except at its own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident." App. at 20a; see R. Long, supra note 7, §§ 5.72-5.73; cf. Sargent v. Johnson, 551 F.2d 221 (8th Cir.1977) (insured breached duty of good faith; insurer not liable for settlement).