LUCKER MANUFACTURING, A UNIT OF AMCLYDE ENGINEERED PRODUCTS, INC.

v.

The HOME INSURANCE COMPANY.

Civ. A. No. 92–4271.

United States District Court, E.D. Pennsylvania.

April 7, 1993.

---

Kevin J. Kehner, Thomas J. Elliott, Elliott, Bray & Riley, Blue Bell, PA, Robert E. Couhig, Jr., A. Kirk Gasperecz, Lisa L. Maher, Adams & Reese, New Orleans, LA, for plaintiff.

William T. Salzer, Swartz, Campbell & Detweiler, Philadelphia, PA, for defendant.

## MEMORANDUM

PADOVA, District Judge.

This case involves a dispute over the extent of coverage provided by a comprehensive general liability ("CGL") insurance policy and asks the Court to construe what is known as a "loss of use" clause within such a policy. Cross-motions for summary judgment under Fed.R.Civ.P. 56(c) have been filed, oral argument on these motions has been heard, and the issues have been fully briefed.[1] For the following reasons, I will enter summary judgment in favor of defendant The Home and against plaintiff Lucker Manufacturing, A Unit of Amclyde Engineered Products, Inc. ("Lucker").

The CGL coverage question involved here arises from a previous lawsuit filed in this Court by Lucker against Milwaukee Steel Foundry, A Division of Grede Foundries, Inc. ("Grede"), C.A. No. 91–2258.[2] To fully comprehend the issues in the instant matter, the circumstances underlying and surrounding this previous lawsuit must be explained.

In late 1989, Lucker entered into an agreement with Shell Oil Company ("Shell") to produce a Lateral Mooring System ("LMS") for Shell's use. *See* Complaint, *Lucker Mfg. v. Milwaukee Steel Foundry, A Div. of Grede Foundries, Inc.*, No. 91–2258 (E.D.Pa.) ("Grede Complaint") at ¶¶ 5–6, 14, 17. A LMS is a device fixed to the ocean floor which holds in place vessels floating on the surface. *See id* at ¶¶ 6–8. Among its components are three "Grip Body and Grip Lid Castings" and twelve "Foot Mount Castings" (collectively, the "castings"). *See id.* In October 1989, Lucker arranged to have Grede produce the castings pursuant to Lucker's designs and specifications. *See id.* at ¶¶ 8–9. Grede subsequently produced the castings and delivered them to Lucker in March 1990. *See id.* at ¶ 10.

In April 1990, Lucker invited Shell to witness an "equipment load test" of the castings at Lehigh University. *Id.* at ¶ 11. During this test, "a catastrophic failure of one of the Grip Lid Castings occurred." *Id.* As a result of this failure, Shell imposed higher standards and requirements upon Lucker with

---

1. Defendant The Home Insurance Company ("The Home") previously filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Because the arguments made in that motion were also incorporated into The Home's subsequent motion for summary judgment, which is presently before me, I denied the motion as moot on December 11, 1992. Any arguments made by The Home in its prior motion to dismiss will be considered as having been asserted here.

2. This case was assigned to the Honorable Clarence C. Newcomer of this Court.

regard to the production and testing of steel for the castings and the LMS. *Id.* at ¶¶ 14–17, 46. Lucker apparently complied with Shell's heightened standards and subsequently initiated the underlying suit against Grede in April 1991 to recover, *inter alia*, the increased costs of meeting these standards.[3] *See id.* Lucker based its suit upon theories of strict products liability, breach of contract, breach of express and implied warranties, and negligence.

At the time of these events, The Home insured Grede pursuant to a CGL policy ("the policy") covering the period from December 1, 1989 to December 1, 1990. *See* Defendant The Home's Memorandum of Law in Opposition to Lucker's Motion for Summary Judgment ("The Home's Memorandum in Opposition") at 2; Lucker's Memorandum of Law in Support of Motion for Summary Judgment ("Lucker's Memorandum in Support") at 2. Grede made a claim for defense and indemnification under the policy as to Lucker's lawsuit, which The Home conditionally honored on April 26, 1991 by tendering a defense to Grede pursuant to a reservation of rights letter. *See* The Home's Memorandum in Opposition at 5–6 and Exhibit F attached thereto. The case then proceeded through a series of pretrial motions, one of which resulted in a Memorandum and Order by Judge Newcomer dismissing with prejudice Lucker's tort claims against Grede.[4] Shortly thereafter, The Home reassessed its obligations under the policy, withdrew its defense of Grede, and disclaimed all liability under the policy. *See* The Home's Memo-

randum in Opposition at 6 and Exhibit G attached thereto.

With Grede now responsible for its own defense, the case moved to trial on the remaining contract claims. On December 12, 1991, a jury returned a verdict in favor of Lucker in the amount of $484,278.[5] Notwithstanding this jury verdict, Lucker and Grede entered into an agreement in April 1992 in settlement of all of Lucker's claims except Lucker's loss of business reputation claim then pending before the Third Circuit. *See* Exhibit E attached to Lucker's Memorandum in Support. Pursuant to this agreement, Grede paid Lucker $600,000 and assigned to Lucker all of its rights against The Home to recover defense costs and indemnification under the policy, subject to an agreement to share in ten percent of the proceeds of any recovery Lucker might receive. *See id.*

Grede's policy rights in hand, Lucker initiated the instant lawsuit against The Home to vindicate those rights, asserting this Court's jurisdiction under 28 U.S.C. § 1332 to hear cases between diverse parties.[6] Lucker seeks recovery from The Home under theories of breach of duties to defend and indemnify and for insurer bad faith under 42 Pa. Cons.Stat.Ann. § 8371 (Purdon's Supp.1992).[7] The parties agree that there are no factual disputes and that this case should be summarily decided on the present record. The questions presented are whether the policy obligated The Home to defend and indemnify

---

**3.** Lucker also sought to recover damages for the actual cost of the castings charged by Grede, the cost of testing the castings at Lehigh University, loss of competitive advantage and consequent loss of profits in bidding on other Shell contracts, loss of profits for future LMS contracts with Shell and other prospective customers, loss of business reputation, and other unspecified direct and consequential damages. *See id.*

**4.** Judge Newcomer held that Lucker sought recovery of economic losses only and that Pennsylvania does not recognize a cause of action under strict products liability or negligence to recover such losses. *See Lucker Mfg. v. Milwaukee Steel Foundry,* 777 F.Supp. 413 (E.D.Pa.1991).

**5.** Judge Newcomer prohibited Lucker at trial from introducing evidence supporting its claim for loss of business reputation. Lucker appealed

this ruling to the Third Circuit, which has since dismissed the appeal.

**6.** Lucker is a Minnesota corporation with its principal place of business in Minnesota. The Home is a New Hampshire corporation with its principal place of business in New York, NY.

**7.** Lucker's complaint also contains a count for declaratory relief against The Home in the event the Third Circuit ruled in favor of Lucker on its appeal regarding evidence of loss of business reputation. As this appeal has been dismissed by the Third Circuit, Lucker agreed at oral argument that this count is, in effect, moot. I will therefore dismiss this count.

Grede and, if so, whether The Home breached its obligations in bad faith.

## I.

■ I note at the outset that in resolving the coverage questions presented, the parties have agreed that I may apply interchangeably both the substantive law of Pennsylvania, where the failure of the castings occurred, and of Wisconsin, where the policy was purchased, Grede is located, and the castings were produced.[8] *See* Hearing Transcript at 7–9. The parties agree that the respective bodies of case law in these states concerning both an insurer's duty to defend and policy interpretation questions are, for purposes of this case, effectively identical. The only choice of law issue outstanding is whether Pennsylvania's insurer bad faith statute applies. As will be seen shortly, however, I need not reach this issue.

In determining an insurer's duty to defend, I note that

> "[u]nder Pennsylvania law, an insurance company is obligated to defend an insured whenever the complaint filed by the injured party may *potentially* come within the policy's coverage.... The obligation to defend is determined solely by the allegations of the complaint in the action.... The duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy."

*Imperial Casualty & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 131–32 (3d Cir.1988) (quoting *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 760 (3d Cir.1985)) (citations in *Linn* omitted) (emphasis in *Linn*). *See also Sola Basic Indus., Inc. v. United States Fidelity & Guar. Co.*, 90

Wis.2d 641, 280 N.W.2d 211, 213–14 (1979) ("[I]t is necessary to determine whether the complaint alleges facts which, if proven, would give rise to liability covered under the terms and conditions of the policy.").

The CGL policy in this case provides that The Home

> will pay those sums that the insured [Grede] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.... This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence"....

*See* Comprehensive General Liability Coverage Form ("the policy"), attached as Exhibit B to The Home's Memorandum in Opposition. The policy also contains a listing, which need not be set forth here, of several circumstances in which coverage is specifically excluded.

■ To determine whether The Home was obligated under the terms of the policy to defend Grede in the underlying proceeding, I must first consider whether the complaint in the underlying proceeding *potentially* sought damages from Grede for "bodily injury" or "property damage."[9] As there has been no allegation of bodily injury in the underlying proceeding and neither party asserts the contrary, my inquiry will focus upon the presence of "property damage."

The policy defines "property damage" as
> a. Physical injury to tangible property, including all resulting loss of use of that property; or
>
> b. Loss of use of tangible property that is not physically injured.

---

8. Sitting in diversity, I must apply state law to duty to defend and policy interpretation questions. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

9. In interpreting the policy, I am guided by the well-settled principles governing the interpretation of insurance policies under Pennsylvania law, which include the following: if the language of an insurance policy is clear and unambiguous, its ordinary meaning is to be given effect; policy terms should be read to avoid ambiguities; a provision is ambiguous if

reasonable persons on considering it in the context of the entire policy could honestly differ as to its meaning, if ambiguities do exist in the wording chosen by the insurance company, they must be resolved in favor of the insured; a court cannot rewrite the terms of a policy or give them a construction in conflict with the accepted and plain meaning of the language of the policy.
*Imperial Casualty*, 858 F.2d at 131 (footnote omitted).

*Id.* The Home argues that Lucker did not allege in the complaint in the underlying proceeding that the failure of the castings caused either physical injury to . tangible property or the loss of use of tangible property that was not physically injured. Lucker concedes that there was no claim in the underlying action for actual physical injury to property other than the castings, which would not be covered by the policy,[10] but contends that it did seek recovery for damages resulting from the loss of use of its own tangible property—the LMS itself. By this, Lucker means that it essentially lost the use of two things: (1) the LMS as a tangible device by which ocean vessels are anchored in place and (2) the *design* of the LMS, which Lucker also contends is tangible property.

Lucker asserts that paragraphs 14 through 17 of the underlying complaint can be read as at least potentially stating a claim for loss of use of the LMS and the design of the LMS. Because the language of the underlying complaint is of such significance in determining an insurer's duty to defend, I have set forth these paragraphs in their entirety.

14. As a result of the casting's failure at the customer witness equipment load test, Shell imposed higher standards and requirements on Lucker in connection with its contract to produce the LMS. These higher requirements, which imposed severe constraints on production and testing of steel, resulted in increased costs to Lucker of approximately $278,017.00.

15. Lucker contends upon information and belief that Grede knew or should have known that the failure of the castings to meet the specifications of Lucker and the catastrophic failure itself would reasonably cause Shell to impose higher requirements and standards on Lucker in terms of production and testing of steel for these steel castings, and that Lucker would likely incur a loss of competitive advantage in bidding on other Shell projects, as well as

damage to Lucker's business reputation with both Shell and other clients.

16. Lucker contends upon information and belief that had the Grip Body and Grip Lid Castings been properly manufactured by Grede, Shell's newly imposed requirements with respect to the production and testing of the steel would not have been necessary, as the casting would not have failed, but would have successfully performed as required by Shell and as contracted by Lucker.

17. As a consequence of Grede's improper manufacturing of the castings, Lucker has incurred substantial damages, not only in the form of the actual costs of the castings, out-of-pocket testing costs, and increased costs in the rendering of the Shell contract itself, but lost profits due to Lucker's loss of competitive advantage in bidding on other Shell projects, as well as loss of future profits due to injury to Lucker's business reputation with both Shell and other clients.

Underlying Complaint at ¶¶ 14–17.

Lucker asserts that this language at least potentially states a claim for damages arising out of *Lucker's own loss of use* of the LMS and the LMS design. I disagree. Reduced to their relevant essentials, these averments state that due to the failure of the castings, Lucker was damaged as a result of Shell's imposition of additional standards and requirements on Lucker "in connection with its *contract* to produce the LMS." Underlying Complaint at ¶ 14 (emphasis added); *see also* ¶ 17 ("increased costs in the rendering of the *Shell contract itself*" (emphasis added)). Put differently and in the light most favorable to the insured, *see, e.g., Sola Basic Industries,* 280 N.W.2d at 214, Lucker averred that due to the failure of the castings, it could no longer *sell* the original LMS or LMS design[11] to Shell because Shell im-

---

10. *See* Lucker's Reply Memorandum to Defendant's Opposition to Lucker's Motion for Summary Judgment at 7. Exclusion K of the policy expressly excludes coverage for damage to the insured's property, which would exclude coverage for damage to Grede's castings. *See* the policy at Exclusion K.

11. Lucker argues that it sought damages for loss of use of "the LMS" and the "LMS design." Although there is no indication in the underlying complaint that the LMS had actually been produced at the time the castings failed (and thus no indication that the LMS was a "usable" device susceptible to becoming "useless"), I will assume for purposes of determining The Home's duty to

posed additional requirements; and it was the cost of complying with these additional requirements that Lucker sought to recover. There is no indication in the underlying complaint, either by inference or otherwise, that because of Shell's additional requirements, the original LMS or LMS design could no longer be used to anchor ocean vessels in place or perform any of the other tasks for which each may have been intended.[12] Yet that is what is meant by "loss of use" under the policy.

The cases cited by both parties interpreting "loss of use" clauses in CGL policies involve allegations that the property at issue could no longer be put to use in the manner in which it was intended. For instance, in *Sola Basic Industries*, the insured was sued when a transformer it had manufactured for use in an electric steel furnace owned by Thunder Bay Manufacturing ("Thunder Bay") was damaged by the insured's employee who had been sent to repair the transformer. 280 N.W.2d at 212–13. As a result of the damage to the transformer, Thunder Bay claimed to have suffered damages because it was no longer able to operate its furnace. Seeking coverage under a CGL policy very similar to the policy at issue in this case, the insured demanded defense and indemnification, which the insurer refused. The Supreme Court of Wisconsin held for the insured and found that Thunder Bay's loss of use of its furnace was a covered "loss of use" of tangible property under the policy.

In so holding, the court quoted with approval comments made by the National Bureau of Casualty Underwriters and the Mutual Insurance Rating Bureau in 1966 regarding "loss of use" clauses in CGL policies:

> An example [of a covered "loss of use"] would be the breaking down of a large piece of contractor's equipment on a public street in such a manner that the street

must be closed off for a period of time and the public has limited or no access to the stores located in the block affected. Under the definition of "damages" loss of use claims from the operators of these stores would be covered. There is no prerequisite of physical injury to the stores. *It seems sufficient that the stores sustained damage when they could not be used for the purpose for which they were designed or intended.*

*Id.* 280 N.W.2d at 214 (quoting Obrist, *The New Comprehensive General Liability Insurance Policy: A Coverage Analysis* 7 (Defense Research Institute Monograph 1966)) (emphasis added). In this hypothetical situation, there would be a covered "loss of use," even though the stores had not sustained physical damage, because the insured's equipment impinged upon a condition necessary to their intended use—physical access by customers. Likewise, Thunder Bay's furnace could not be used as intended, even though it was not physically damaged, because the transformer necessary to the intended use of the furnace was damaged by the insured's employee.

In *Baldt Inc. v. American Universal Ins. Co.*, 599 F.Supp. 955 (E.D.Pa.1985), a case heavily relied upon by Lucker, the insured manufactured and sold anchor chains to Diamond M. Company ("Diamond M") for use on Diamond M's off shore oil rigs. The chains failed while being "storm tensioned" and "hauled" by Diamond M, and Diamond M subsequently brought suit against the insured for loss of use of Diamond M's oil rigs during the five days required to replace the chains. *Id.* 599 F.Supp. at 956–57. Here again, the insured was covered by a CGL policy similar to the one at issue in this case, and the insurer refused to defend and indemnify. Seeking coverage, the insured subsequently brought suit against the insurer.

---

defend that the LMS did exist, because I must view the underlying complaint for what it might have "potentially" pled. I will also assume that an "LMS design" existed as well.

12. Indeed, the implication of the underlying lawsuit is exactly the opposite. Lucker alleges that it was the failure of the castings produced by Grede, not its LMS or LMS design, that caused Shell to impose new requirements. In other

words, as far as Lucker was concerned, the LMS and LMS design originally proposed to Shell remained perfectly useful, even after the failure of the castings, as a device and design capable of anchoring ocean vessels in place. The failure of Grede's castings had the undesirable consequence of reducing the *acceptability* of the LMS and LMS design to Shell.

The court held that Diamond M's loss of use of its oil rigs was a covered occurrence under the policy. *Id.* at 957. Simply put, the oil rigs could not be used as intended, even though not physically damaged, because the anchor chains necessary to their intended use had failed.

In *McDowell–Wellman Eng'g Co. v. Hartford Accident & Indem. Co.*, 711 F.2d 521 (3d Cir.1983), a movable ore bridge constructed by the insured and used by Alan Wood Steel Company ("Alan Wood") to carry raw materials to waiting railroad cars, which would then carry the material to two blast furnaces, collapsed. Alan Wood sued the insured for, among other things, business interruption losses resulting from the cost of implementing alternative means of transporting the ore to the blast furnaces. *Id.* 711 F.2d at 522–23. Covered by a CGL policy very similar to the policy at issue here, the insured sought defense and indemnification from its insurer, which was refused. The insured subsequently sued on the policy, arguing, *inter alia,* that Alan Wood's business interruption claim represented a claim for the loss of use of the blast furnaces caused by the collapse of the ore bridge. *Id.* at 526.

Finding that " 'the collapse of the ore bridge [did not] prevent the continued use of the blast furnaces or impair their capacity to produce steel,' " the district court rejected the insured's argument. *Id.* at 526 (quoting finding made by district court). In distinguishing *Sola Basic Industries,* the district court noted that

> "[t]he critical difference between *Sola* and the instant matter is that in *Sola* removing the transformer rendered Thunder Bay's furnaces inoperable until the transformer was replaced. Here the collapse of the ore bridge did not so affect Alan Wood's blast furnaces which not only remained operable but actually continued to be operated by Alan Wood without interruption."

*Id.* (quoting opinion of district court). On appeal, the Third Circuit affirmed:

> We think the district court was correct in holding that Alan Wood's claim for business interruption loss does not reflect the loss of use of the blast furnaces but rather the loss of use of the ore bridge. Alan Wood's itemized damages are merely the expenses it incurred to obtain an alternative means of storing and moving raw materials after the bridge collapsed.

*Id.* at 527.

*McDowell–Wellman* plainly illustrates what is meant by "loss of use" in a typical CGL policy. Both the district court and the Third Circuit found that there was no "loss of use" because the blast furnaces were capable of operating and producing steel as intended, despite the collapse of the ore bridge. In other words, there was no covered "loss of use" because the ore bridge was not necessary to, and its failure did not affect, the intended use of the blast furnaces.

■ Returning to Lucker's allegations in the complaint in the underlying proceeding, there is no indication that Shell's alteration of the LMS contract through the imposition of additional requirements rendered the original LMS or LMS design incapable of holding vessels in place on the ocean surface. Nor is there any indication that Shell's acceptance of the original specifications for the LMS and LMS design was in any way necessary to their use in this manner. We can infer only that the failure of the castings caused *Shell* to no longer *want* to use them as originally conceived. Whether they were incapable of their intended use by *Lucker,* which is the basis of Lucker's "loss of use" argument, is not addressed, and no claim for related damages even potentially appears. Lucker alleged no more that when the castings failed, its customers demanded a revised LMS and LMS design.

Lucker argues, however, that the "use" of the original LMS and LMS design it intended was not to hold ocean-going vessels in place but to profit from the *sale* of the LMS device and design to Shell and other customers. As a result of the failure of the castings, Lucker contends, both the LMS it intended to sell to Shell and the LMS design with which it intended to produce and sell other LMSs were rendered "useless" for this purpose because Shell imposed additional requirements. This novel argument also fails under close scrutiny of the underlying complaint.

There is no indication in the underlying complaint, either by inference or otherwise, that Lucker was ever unable, due to the failure of the castings or otherwise, to offer the original LMS for sale to Shell or to offer use of the original LMS design to other customers. Lucker simply complained that when offered, Shell and perhaps other customers wanted something different because of the failure of the castings. Thus Lucker did not allege a loss of an intended *use* of the original LMS as merchandise for sale or the original LMS design as a means of producing such merchandise; Lucker alleged a loss of an expected *customer acceptance* of its product and design.

And loss of customer acceptance of a product or design is in no way the equivalent of "loss of use" of a product or design under the policy. To equate the two would be to link CGL coverage to the vagaries of customer desire and make insurers of liabilities into guarantors of markets for goods and services.[13] The CGL policy at issue here committed The Home to no such undertaking. The Home contracted to defend and indemnify Grede for damages resulting from the loss of use of *tangible* property only. Business reputation, profits, and other business and economic losses are intangibles and, as Lucker itself concedes, losses of such are not covered under the policy. *See* Plaintiff, Lucker's, Memorandum in Opposition to Defendant's Motion for Summary Judgment at 11; *Lowenstein Dyes & Cosmetics, Inc. v. Aetna Life & Casualty Co.*, 524 F.Supp. 574, 577 (E.D.N.Y.1981), *aff'd without opinion*, 742 F.2d 1437 (2d Cir.1983); *Ludwig Candy Co. v. Iowa Nat'l Mut. Ins. Co.*, 78 Ill.App.3d 306, 310, 33 Ill.Dec. 605, 608, 396 N.E.2d 1329, 1332 (1979). Likewise, customer acceptance of or desire for a product or design is intangible, and thus the loss of such is not covered.[14]

In summary, then, I find that Lucker's complaint in the underlying action does not allege damages for "loss of use" of the original LMS or LMS design, or any other form of covered property damage under the policy. Accordingly, I find that The Home was justified as a matter of law in withdrawing its defense of Grede in the underlying action. I will therefore enter summary judgment in favor of The Home on Lucker's claim for breach of duty to defend.

## II.

■ I will also enter judgment in favor of The Home on Lucker's claim for breach of duty to indemnify. "An insurer has a duty to indemnify its insured only if it is established that the insured's damages are actually within the policy coverage." *Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.*, 766 F.Supp. 324, 334 (E.D.Pa.1991) (Pennsylvania law), *aff'd in part, rev'd in part without opinion*, 961 F.2d 209 (3d Cir.1992). As characterized by Lucker, the damages it recovered from Grede, the insured, as a result of the underlying jury verdict included: (1) $32,934 for the actual cost of the castings; (2) $200,007 in "Test Project Costs"; and (3) $251,337 for the "Cost Absorbed to repro-

13. Consider the absurdity created when the hypothetical situation mentioned in *Sola Basic Industries* is changed in accordance with Lucker's view of CGL coverage, so that the equipment breaks down in a parking lot near, but in no way obstructing access to, the stores and a few customers refuse to enter the stores simply because they would rather not shop in stores near which are parked large pieces of equipment. Lucker's view would require that an insurer defend and indemnify the owner of the equipment for any sales lost by the stores, even though the stores remain open and accessible to all customers should they chose to shop. Coverage would depend entirely upon customer tastes, which could just as easily have been ambivalent to the presence of the equipment, rather than an inability to use the stores for their intended purpose as a forum for shoppers.

Placed in context with the instant situation, Lucker pled that Shell's dissatisfaction with the LMS and LMS design caused it damages, not any inability to use the original LMS or LMS design as merchandise. Thus Lucker essentially asks The Home to provide indemnification under the policy because Lucker's customers, having come to Lucker's store, walked away without an LMS, as originally conceived, when the castings failed.

14. By this statement, I do not mean to speak in any way on whether a service or design such as the original LMS design is "tangible property" under the policy, the "loss of use" of which may be considered "property damage." The parties argue both sides of this question but I need not resolve the debate: I have found that, in any event, Lucker did not plead a "loss of use" of the original LMS design in the underlying complaint.

duce Shell's casting to a higher specification." *See* Lucker's Memorandum in Support at 15. None of these damages are within the policy coverage.[15]

As to the first of these damages, Lucker itself agrees, as mentioned above, that the cost of the actual castings (Grede's product) is specifically excluded under the policy. *See supra* note 10 and accompanying text. Turning next to the "Test Project Costs," Lucker describes these damages as "the cost incurred by Lucker in the teardown and storage at Lehigh University, the retest costs, as well as the additional labor costs." *See* Lucker's Memorandum in Support at 15. Without elaboration, Lucker contends that these damages are within the policy coverage for the reasons stated in *Arcos Corp. v. American Mut. Liability Ins. Co.*, 350 F.Supp. 380 (E.D.Pa.1972), *aff'd*, 485 F.2d 678 (3d Cir.1973).

*Arcos* involved a claim by General Dynamics against the manufacturer of a special weld wire called "Inconel" purchased by General for use in the construction of a nuclear power plant aboard a submarine. *Id.* at 382. After using the weld wire, General Dynamics began to notice that some of the welds it made were not composed of Inconel but a different type of weld wire. *Id.* General Dynamics subsequently sued the manufacturer of the weld wire for the cost of testing the various welds it had made and ripping out those which were not of Inconel. *Id.* The manufacturer sought defense and indemnification from its CGL insurer; coverage was denied; and the manufacturer sought judicial vindication of its policy rights.

In finding for the manufacturer on summary judgment, the court held, among other things, that the testing and removal costs sustained by General Dynamics were "property damage" under the CGL policy, citing two Third Circuit opinions addressing property damage resulting from the incorporation of an insured's product into other property. *Id.* at 383 (citing *Bowman Steel Corp. v. Lumbermans Mut. Casualty Co.*, 364 F.2d 246, 249–50 (3d Cir.1966); *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co. of New York*, 281 F.2d 538, 541–45 (3d Cir.1960)). The issue in these two Third Circuit decisions and in a more recent Third Circuit opinion construing *Pittsburgh Plate Glass*, *see Imperial Casualty & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, was whether the occurrences involved constituted "property damage" to property other than the insured's own product.[16] In *Pittsburgh Plate Glass*, for example, the court found that there was "property damage" to property other than the insured's own product where the insured's product—paint—had been baked onto venetian blinds and later flaked and peeled. 281 F.2d at 541. Remarked the court in *Imperial Casualty*, "the purchaser [of the paint] created a new product [the blinds] having a value in excess of the value supplied by the insured [in the paint], and suffered damage to more than just the insured's product [when the paint flaked and peeled from the blinds]." 858 F.2d at 134–35. Likewise, because General's use of the weld wire in *Arcos* necessarily created a new product (the weld wire was presumably melted into components of the nuclear power plant), there was damage to more than just the insured's product (the weld wire), and the Court held that the costs of testing to locate the improper welds and removing them was covered "property damage."

There is no assertion or other evidence in this or the underlying proceeding, however, that the testing which gave rise to the "Test Project Costs" was necessary to uncover property damage to property other than the castings, such as the LMS. Indeed, there is no assertion or evidence that the Grede castings were ever incorporated into the LMS,

---

**15.** Although Lucker and Grede subsequently settled their dispute for an amount greater than the jury verdict, I would nonetheless be required to apportion their settlement among the counts in the underlying action were I to award Lucker damages here. *See Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.*, 766 F.Supp. at 334. To do so, I would use the jury verdict as my guide and thus use it here in order to determine whether any amount of the settlement is within the policy coverage.

**16.** Like the CGL policy here, the CGL policies in these cases excluded coverage for damage to the insured's own product.

and Lucker has admitted that there was no claim in the underlying action for physical injury to property other than the castings. *See supra* note 10 and accompanying text. Additionally, the only assertion of "property damage" pressed by Lucker here is for its own loss of use of the LMS, which has nothing whatsoever to do with the identified testing costs and which I have already rejected as a theory of recovery. Therefore, because the "Test Project Costs" are not related to covered "property damage," I find that they are not within the policy coverage.

The final category of damages to be considered are those costs absorbed by Lucker in reproducing Shell's casting to a higher specification. These are the costs Lucker claims it incurred in revising the original LMS to meet Shell's new requirements and for which Lucker asserts coverage under the loss of use theory rejected above. Accordingly, I find that these damages are not within the policy coverage.

### III.

I mentioned at the outset that I need not determine whether Pennsylvania's insurer bad faith statute, 42 Pa.Cons.Stat.Ann. § 8371, applies as a matter of law to this dispute. This is so because, even if it did apply, Lucker's claim against The Home under the statute must fail. Lucker's claim of bad faith rests entirely upon the contention that The Home breached its duties to defend and indemnify Grede in bad faith. Because I have determined that The Home breached neither of these duties, there can be no claim of bad faith in doing so. I will therefore enter judgment in favor of The Home on this claim.

An appropriate order follows.

### ORDER

AND NOW, this 5th day of April, 1993, upon consideration of the cross motions for summary judgment filed by the parties, all papers filed in support thereof and in opposition thereto, and upon consideration of the arguments made by both parties at a hearing held in this matter, IT IS HEREBY ORDERED for the reasons stated in the accompanying Memorandum that plaintiff's Motion for Summary Judgment is DENIED and defendant's Motion for Summary Judgment is GRANTED as follows:

1. SUMMARY JUDGMENT is entered FOR DEFENDANT and against plaintiff on plaintiff's claims for breach of duty to indemnify, breach of duty to defend, and insurer bad faith.

2. Plaintiff's claim for declaratory relief is DISMISSED as MOOT.