HARTZELL INDUSTRIES,
INC., et al., Plaintiffs,

v.

FEDERAL INSURANCE COMPANY,
et al., Defendants.

No. C–3–99–325.

United States District Court,
S.D. Ohio,
Western Division.

March 26, 2001.

Gerald Williams Simmons, Thompson, Hine & Flory–1, Cincinnati, OH, for Plaintiffs.

John Charles Scott, Faulkner & Tepe–1, Cincinnati, OH, Alice Barns Herrington, Louisville, KY, for Defendants.

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART, WITHOUT PREJUDICE TO RENEWAL, PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. #21); DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #23) OVERRULED IN PART AND OVERRULED IN PART, WITHOUT PREJUDICE TO RENEWAL; CONFERENCE CALL SET

RICE, Chief Judge.

This litigation stems from an insurance coverage dispute between the Plaintiffs, Hartzell Industries, Inc., and Hartzell Fan, Inc. ("Hartzell"),[1] and the Defendants,

---

1. Hereinafter, the Court will refer to Hartzell Industries and Hartzell Fan collectively as "Hartzell."

Federal Insurance Company and Chubb Corporation ("Federal").[2] Hartzell seeks indemnification under the terms of a commercial general liability insurance policy issued by Federal in 1994. The material facts underlying the present action appear to be undisputed, and proper resolution of this matter turns on the language of the insurance policy.[3]

In 1992, Hartzell supplied the Allegheny Power Company ("Allegheny") with seven roof fans to cool its boiler house. The propellers on one of the fans disintegrated in 1993. As a result of this incident, Hartzell provided Allegheny with replacement propellers for each of the seven fans. Federal subsequently issued its commercial general liability insurance policy to Hartzell, effective August 28, 1994.[4] Thereafter, in November, 1994, the propellers on the same Hartzell fan unit disintegrated a second time. As a precaution, Allegheny shut down all seven of the fans. After Hartzell and Allegheny failed to reach an agreement as to the cause of the failures and an appropriate remedy, the power company filed suit against Hartzell, seeking to recover damages of $371,000 plus costs, interest and attorney's fees. In a second amended complaint, Allegheny broke down its $371,000 damages figure as follows:

    1.  $12,000 to retain an outside consultant to perform metallurgical and vibration reviews concerning the 1993 fan failure;

    2.  $281,000 in craft labor costs and engineering time from November, 1994, through August 1996, to repair, remove and replace fan components;

    3.  $28,000 to retain an outside consultant "for review and testing for the aborted vibration strain gauge testing in July 1995"; and

    4.  $50,000 in lost worker productivity during the summers of 1993 and 1995 as a result of the hot work environment attributable to the lack of functioning roof fans.

(Doc. # 21 at Exh. E–3, ¶ 21, 61, 63).

Hartzell tendered the defense of Allegheny's lawsuit to Federal, which agreed to defend under a full reservation of rights. (*Id.* at Exh. G; Doc. # 23 at Exh. 4). On February 23, 2000, Hartzell and Federal settled the lawsuit for $210,000. Of that amount, Hartzell contributed $160,000, and Federal paid $50,000. (Doc. # 21 at Exh. K). Hartzell contends, however, that the commercial general liability insurance policy at issue obligated Federal to pay all but $15,647 (which represents the damage to the fan itself) of the $210,000 settlement. As a result, Hartzell commenced the present litigation, seeking to recover the $144,353 that it allegedly overpaid.

## I. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for sum-

---

**2.** The Plaintiffs' Complaint alleges that Chubb Corporation is the "parent" and "alter ego" of Federal Insurance Company (Doc. # 1 at ¶ 6). Consequently, the Court will refer to Federal and Chubb collectively as "Federal."

**3.** For purposes of its analysis herein, the Court will view the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Defendants when reviewing the Plaintiffs' Motion for Summary Judgment.

Conversely, when reviewing the Defendants' Motion for Summary Judgment, the Court will view the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiffs.

**4.** Given that Federal did not issue the insurance policy to Hartzell until after the first fan failure, that incident is not part of the present litigation, which concerns only the second fan failure.

mary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C.*

*Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations

must be left to the fact-finder. 10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. *Analysis*

■ Resolution of the pending cross Motions for Summary Judgment turns upon the proper interpretation of the commercial general liability insurance policy at issue. The Sixth Circuit has summarized the controlling principles of Ohio insurance law as follows:

"In determining the plain meaning of an insurance contract, the contract should be read as a whole and each word given its appropriate meaning, if possible." *Burdett Oxygen Co. of Cleveland v. Employers Surplus Lines Ins. Co.*, 419 F.2d 247, 248 (6th Cir.1969) (citing *Farmers' Nat'l Bank v. Delaware Ins. Co.*, 83 Ohio St. 309, 94 N.E. 834 (1911)). Where a policy is ambiguous, it is to be liberally construed in favor of the insured. *Fuerstenberg v. Mowell*, 63 Ohio App.2d 120, 122, 409 N.E.2d 1035 (1978). This rule of construction, however, is not applicable if the language is clear, *Fuerstenberg*, 63 Ohio App.2d at 122, 409 N.E.2d 1035, if applying it, would provide an unreasonable or forced interpretation, *Bright v. Ohio Casualty Ins. Co.*, 444 F.2d 1341, 1343 (6th Cir.1971) (citing *Morfoot v. Stake*, 174 Ohio St. 506, 190 N.E.2d 573 (1963)), or if it would result in an extension of coverage. *West v. McNamara*, 159 Ohio St. 187, 197, 111 N.E.2d 909 (1953).

*Messer v. Paul Revere Life Ins. Co.*, 884 F.2d 939, 940 (6th Cir.1989) (quoting *United States v. Strip*, 868 F.2d 181, 185 (6th Cir.1989)).[5]

With the foregoing principles in mind, the Court turns now to the language of the Federal insurance policy issued to Hartzell. In relevant part, the policy provides Hartzell with insurance coverage for "property damage" caused by an "occurrence" during the policy period.[6] (Doc. # 21 at Exh. A). The policy defines "property damage" as "physical injury to tangible property[,] including all resulting loss of use of that property," *or* "loss of use of tangible property that is not physically injured." The policy defines the term "occurrence" as an "accident, including continuous or repeated exposure to

---

5. The parties agree that the present insurance coverage dispute is governed by Ohio law.

6. As noted, *supra,* the first fan failure occurred in 1993, *before* Federal issued an insurance policy to Hartzell. With respect to the second fan failure, Federal admits that it took place while the insurance policy was in effect.

substantially the same general harmful conditions." (*Id.*).

In support of its Motion, Hartzell does not argue that the failure of its fan caused Allegheny to suffer any physical injury to tangible property.[7] Rather, Hartzell seeks to establish the existence of "property damage" under the second definition set forth above. In particular, Hartzell contends that Allegheny lost the use of tangible property (its boiler house), even though that tangible property was not physically injured.[8] Hartzell also asserts that Allegheny's loss of use of its boiler house was caused by an "occurrence" (i.e., an "accident"), namely the catastrophic failure of its fan. As a result, Hartzell insists that a covered loss exists under the terms of the Federal policy. Finally, Hartzell argues that *all* of the damages claimed by Allegheny were covered losses which flowed from the loss of use of the boiler house. (*See generally* Doc. # 21 at 11–14).

7. The parties agree that the "physical injury" to Hartzell's fan itself is not covered under the Federal insurance policy.

8. In a Memorandum supporting its Motion for Summary Judgment, Hartzell contends that Allegheny lost the use of its boiler house. (Doc. # 21 at 11, 13, 15). In its reply Memorandum, however, Hartzell argues not that Allegheny lost the use of its boiler house as a whole, but that it lost the use of a "ventilation system," which purportedly incorporated Hartzell's fans. (Doc. # 32 at 4). For purposes of ruling on Hartzell's Motion, the Court will treat its "loss of use" claim as one involving the loss of use of the boiler house as a whole, as opposed to just a "ventilation system." The Court will do so for two reasons. *First,* Hartzell argued in its opening summary judgment Memorandum only that Allegheny lost the use of its boiler house, not a "ventilation system," as a result of the fan failure in November, 1994. *Second,* the record reveals a genuine issue of material fact as to whether Hartzell's fans were incorporated into any true "ventilation system," which Allegheny lost the use of after the fan failure in November, 1994. In deposition testimony, Thomas J. Gustafson, a mechanical engineer employed by Hartzell, explained that the sev-

In support of its cross Motion, however, Federal contends that Hartzell cannot establish covered "property damage" caused by an "occurrence." (Doc. # 23). Federal first argues that Allegheny did not lose the use of its boiler house as a result of the fan failure. Rather, the power company merely lost the use of the roof fans. Given that the fans themselves (which are not covered under the insurance policy) were the only tangible property that could not be used, Federal insists that Hartzell cannot establish "property damage" based on the "loss of use of tangible property that is not physically injured." In a related argument, Federal contends that Allegheny's alleged damages resulting from reduced worker productivity due to the heat in the boiler house are "purely economic losses," which do not constitute the loss of use of "tangible property." [9] (*Id.* at 21–24). Finally, with respect to the issue of coverage, Federal argues that Hartzell cannot estab-

en fans *were not* part of any "ventilation system." Rather, they were simply attached below holes in the roof. (Gustafson depo. at 9). If Allegheny only lost the use of Hartzell's fans, however, (as opposed to losing the use of a larger "ventilation system" that incorporated the fans), then Hartzell would be unable to establish covered "property damage" based on the loss of use of the fans.

9. In support of its argument regarding "economic damages," Federal cites, inter alia, an unreported Sixth Circuit decision, *United States Fire Ins. Co. v. Chardon Rubber Co.,* 961 F.2d 1580, 1992 WL 92671 (6th Cir. April 23, 1992). According to Federal, *Chardon* involved the collapse of an ore bridge. (Doc. # 31 at 3). Having reviewed that decision, the Court notes that it has absolutely nothing to do with an ore bridge. In *McDowell–Wellman Engineering Co. v. Hartford Accident and Indemnity Co.,* 711 F.2d 521 (3rd Cir. 1983), however, the Third Circuit did discuss the collapse of an ore bridge and a claim that the collapse resulted in property damage to a blast furnace, which used the bridge for the shipment of raw materials. The Court will address *McDowell–Wellman* more fully, *infra.*

lish any property damage resulting from an "occurrence," which the policy defines as an "accident." According to Federal, Allegheny's losses did not result from an accident, but from Hartzell manufacturing a defective fan that simply failed to comply with the power company's specifications. (*Id.* at 24–26).

■ Upon review, the Court finds Federal's arguments to be unpersuasive. As noted above, the insurance policy defines "property damage" as the "loss of use of tangible property that is not physically injured." Allegheny's complaint alleged that its boiler house became hot, resulting in decreased worker productivity in the summer of 1995, as a result of the power company's inability to use Hartzell's roof fans.[10] (Doc. # 21 at Exh. E–3, ¶ 63). This allegation qualifies as a covered "loss of use of tangible property that is not physically injured." Although Allegheny did not shut down the boiler house after the fan disintegration (i.e., there was not a *total* loss of use), the boiler house became *less useful* because the fans were turned off. As a result of the increased heat, Allegheny suffered a loss of productivity in its boiler house (i.e., there was a *partial* loss of use). The Federal insurance policy at issue defines "property damage" as the "loss of use of tangible property that is not physically injured." The policy does not specify that the loss of use must be total as opposed to partial.

Notably, another portion of the Federal policy strongly suggests that "property damage" *does* exist if Allegheny's boiler house simply became "less useful" as a result of the fan failure. As will be discussed more fully, *infra*, the Federal policy contains a provision excluding "impaired property" from coverage. "Impaired property" is defined as tangible property (i.e., the boiler house) other than Hartzell's fans "that cannot be used or is *less useful*" because:

(1) it incorporates Hartzell's fans; or

(2) Hartzell has failed to fulfill the terms of a contract with Allegheny, if the tangible property (i.e., the boiler house) can be restored to use by either:

a. the repair, replacement, adjustment or removal of the fans; or

b. Hartzell fulfilling the terms of its contract with Allegheny.

(Doc. # 21 at Exh. A).

■ In the present case, Allegheny alleged that its boiler house became less useful as a result of the hot working environment caused by the failure of Hartzell's fan, which was incorporated into the facility and had to be shut down.[11] As will be discussed more fully, *infra*, this allegation fits squarely within the impaired property exclusion of the Federal policy.[12] The Court notes, however, that the impaired property exclusion from coverage would be entirely unnecessary if the partial loss of

---

**10.** Allegheny's complaint also alleged lost worker productivity as a result of the 1993 fan failure. (Doc. # 21 at Exh. E–3, ¶ 63). As noted above, however, the 1993 fan failure is not at issue in this litigation.

**11.** Federal disputes that Allegheny ever alleged its boiler house was "less useful," but the insurance company's argument is one of semantics. (*See* Doc. # 30 at 11). Although Allegheny did not use the words "less useful" in its complaint, the power company did allege that, as a result of increased heat attributable to Hartzell's defective fan, it suffered a

loss of worker productivity in the summer of 1995. (Doc. # 21 at Exh. E–3, ¶ 63). Such an allegation is merely another way of saying that its facility was "less useful" due to the failure of Hartzell's fan. As noted above, the Federal policy indicates that "property damage" does exist if tangible property becomes "less useful."

**12.** Although application of the "impaired property" exclusion appears to doom Hartzell, the exclusion contains a significant exception that will be discussed, *infra*.

use of Allegheny's boiler house were not covered in the first instance. In other words, if Federal's allegation that its boiler house became less useful (due to lost worker productivity) as a result of its incorporation of Hartzell's fans did not qualify as "property damage" under the *coverage* portion of the policy, then the "impaired property" *exclusion* from coverage would be superfluous. The presence of such an exclusion demonstrates that Allegheny's "lost worker productivity" claim *does* fit within the definition of "property damage." In short, Federal would have had no need to exclude from coverage certain "tangible property" that becomes "less useful" as a result of its incorporation of the insured's product *unless* such coverage otherwise existed.[13]

The Court also rejects Federal's assertion that Allegheny's alleged damages are "purely economic losses," which do not constitute the loss of use of "tangible property." As noted above, Allegheny lost the partial use of its boiler house (i.e., the boiler house became "less useful") as a result of its incorporation of Hartzell's fans and the failure of one fan to perform as expected.[14] Although the boiler house itself was not physically harmed, the Federal policy defines "property damage" to include the "loss of use of tangible property

that is not physically injured." The Court cannot conceive of damages for the loss of use of tangible property that is not physically injured being anything other than "purely economic losses." *Cf. Gibson & Associates, Inc. v. Home Ins. Co.*, 966 F.Supp. 468, 477 (N.D.Tex.1997) (citing case law from numerous jurisdictions and recognizing that while "purely economic injuries" ordinarily do not qualify as "property damage," such economic losses *do* constitute "property damage" when a commercial general liability policy defines the phrase "property damage" to include the "loss of use of tangible property that is not physically injured").

Finally, the Court rejects Federal's argument that Hartzell cannot establish the existence of an "occurrence." As noted, *supra*, the policy defines the term "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." In the present case, the catastrophic failure of Hartzell's fan was an "accident," within the ordinary meaning of that term. All six of the fan's propeller blades snapped off at the hub, landing on the exhaust screen and fan hood. This disintegration of the fan cannot reasonably be viewed as anything other than an "acci-

---

**13.** Indeed, under Ohio law, the existence of an exclusion from insurance coverage gives rise to a presumption that anything " 'which is not clearly excluded from the operation of such contract is included in the operation thereof.' " *King. v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 214, 519 N.E.2d 1380, 1386 (1988) (quoting *Home Indemnity Co. v. Plymouth*, 146 Ohio St. 96, 64 N.E.2d 248 (1945)).

**14.** In reaching this conclusion, the Court finds distinguishable the Third Circuit's ruling in *McDowell–Wellman*, 711 F.2d at 526, a case upon which Federal relies. In *McDowell–Wellman*, an ore bridge collapsed, making it difficult to ship materials to a blast furnace. Upon review, the Third Circuit reasoned that the owner of the blast furnace did

not suffer a loss of use of his blast furnace. *Id.* In reaching this conclusion, the court noted that the collapse of the nearby ore bridge did not in any way impair the operation of the blast furnace or make it less useful at all. To the contrary, the collapse of the ore bridge only resulted in the loss of use of the ore bridge (the insured's own product, which was not covered under the policy at issue). *Id.* at 526–527. In the present case, however, the failure of Hartzell's fan directly impaired Allegheny's use of the boiler house itself. By failing to remove hot air from the boiler house, Hartzell's defective fan made the facility less useful that it otherwise would have been, because worker productivity declined due to the extreme heat inside the building.

dent." Such a conclusion is consistent with Ohio case law. "In its common, ordinary use, the word 'accidental' means unexpected, as well as unintended." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 666, 597 N.E.2d 1096, 1102 (1992); *see also Erie Ins. Exchange v. Colony Develop. Corp.*, 136 Ohio App.3d 406, 414, 736 N.E.2d 941, 947 (1999) (finding that "allegations of property damage caused by ... negligence in constructing and designing [a] condominium complex reasonably fall within the ... definition of property damage caused by an occurrence—i.e., an accident"); *Bay Mfg. Co. v. Cincinnati Ins. Co.*, 1993 WL 24670 (1993) (reasoning that claims for the negligent manufacture and design of goods fell within meaning of the term "occurrence"). Federal does not suggest that the snapping of the propellers on Hartzell's fan constituted anything other than an unexpected or unintended event.[15] As a result, the failure of the fan in November, 1994, qualifies as an "occurrence" under the terms of the policy.[16]

Given that Hartzell has demonstrated the existence of covered "property damage" caused by an "occurrence," the Court now must examine the exclusions contained in the Federal policy. In support of its Motion for Summary Judgment, Federal argues that two exclusions preclude Hartzell from obtaining any indemnifica-

---

**15.** In reaching this conclusion, the Court finds the cases relied upon by Federal in support of its Motion for Summary Judgment to be distinguishable. In *Jakobson Shipyard, Inc. v. Aetna Casualty and Surety Co.*, 961 F.2d 387 (2nd Cir.1992), a company known as Express Barge purchased two tug boats from Jakobson Shipyard, which had manufactured the boats and installed steering mechanisms in them. Express subsequently sued Jakobson after discovering that the steering mechanisms were defective. Upon review, the Second Circuit found no "occurrence" causing damage to the property of a third party. *Id.* at 389–390. Similarly, in *Royal Plastics, Inc. v. State Auto. Mutual Ins. Co.*, 99 Ohio App.3d 221, 650 N.E.2d 180 (1994), a company called Hercules Products sued Royal Plastics, alleging that Royal Plastics had negligently manufactured certain component parts. The Ohio Eighth District Court of Appeals held that Hercules' complaint did not allege "property damage" arising out of an "occurrence." *Id.* at 182–183. In reaching this conclusion, the appellate court noted that the complaint alleged manufacturing defects but failed to allege any "occurrence," which State Auto's insurance policy defined as an "accident." Unlike the situation in *Jakobson* and *Royal Plastics*, however, Allegheny's complaint against Hartzell *did* allege the existence of an "occurrence" (i.e., an accident). In particular, as noted above, Allegheny's complaint alleged that the propellers on one of Hartzell's fans disintegrated. Based on the reasoning set forth more fully above, the Court concludes that the unintended and unanticipated catastrophic failure of Hartzell's fan cannot be considered anything other than an "accident." Indeed, if one of the shattered propeller blades had hit an Allegheny worker, Federal could not reasonably argue that no "occurrence" had taken place. Although that did not happen, the "occurrence" in such a case would be the same as the "occurrence" in the present case (i.e., the disintegration of a propeller). The only difference between the present case and the Court's hypothetical involving an injured worker lies in the type of damage at issue (i.e., "loss of use" property damage versus personal injury), not in the existence of an "occurrence."

**16.** Once again, the Court's conclusion regarding the existence of an "occurrence" is also supported by the language of the "impaired property" exclusion in the Federal policy. With an exception that will be discussed, *infra*, that provision excludes from coverage "property damage to impaired property or property that has not been physically injured arising out of," inter alia, "a defect, deficiency, inadequacy, or dangerous condition in" Hartzell's fans. (Doc. # 21 at Exh. A). If a defect in an insured's product precluded the insured from establishing an "occurrence," as Federal alleges, then there would be no need to include an "impaired property" exclusion in its insurance policies. Absent the existence of an "occurrence," coverage would not exist in the first place.

tion: (1) a "damage to your product" exclusion; and (2) the previously mentioned "damage to impaired property" exclusion. The Court will address these exclusions in turn.

■ The "damage to your product" provision excludes coverage for "property damage to your product [i.e., Hartzell's fan], arising out of it or any part of it." (Doc. # 21 at Exh. A). The policy defines the phrase "your product" to mean, inter alia, "any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" Hartzell. (*Id.*). In light of this exclusion, Federal contends that Hartzell is precluded from obtaining indemnification for *any* of the damages alleged by Allegheny. In support, Federal reasons:

> Allegheny's claims arise out of damage to the Hartzell fans. Allegheny has not made any claims for damage to property owned by Allegheny. Therefore, Hartzell seeks coverage for damage to property that is clearly excluded by the "your product" exclusion in the Federal policy.

(Doc. # 23 at 28).

Upon review, the Court finds Federal's argument to be unpersuasive. In a limited sense, it is true that all of Allegheny's claims "arise out of" damage to Hartzell's fan. The failure of Hartzell's fan proximately caused all of the damages claimed by Allegheny, and the power company would not have filed suit if a fan had not disintegrated. However, a sweeping interpretation of the "damage to your product" exclusion which precludes coverage whenever an insured's product proximately causes a third-party to suffer property damage would eviscerate coverage entirely, and such an interpretation would run contrary to the plain language of the exclusion. On its face, the "damage to your product" provision only excludes coverage for property damage *to the insured's prod-*uct (i.e., Hartzell's fan) *arising out of the insured's product.* The exclusion does not preclude coverage for property damage *to the property of a third-party* (i.e., Allegheny's partial loss of use of its boiler house) *arising out of the insured's product.*

In apparent recognition of the foregoing distinction, Federal insists that "Allegheny has not made any claims for damage to property owned by Allegheny. Therefore, Hartzell seeks coverage for damage to property that is clearly excluded by the 'your product' exclusion in the Federal policy." (Doc. # 23 at 28). As explained more fully, *supra,* however, Allegheny's claim that the failure of Hartzell's fan rendered its boiler house "less useful" *does* qualify as "property damage" under the terms of the policy. Consequently, the Court cannot agree that Allegheny failed to allege a claim for damage to its own property.

■ Federal's reliance upon the "damage to impaired property" exclusion is also misplaced. That provision excludes coverage for:

> property damage to impaired property or property that has not been physically injured arising out of:
>
> 1. a defect, deficiency, inadequacy, or dangerous condition in your product or your work; or
>
> 2. a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

(Doc. # 21 at Exh. A).

In relevant part, the Federal policy defines the phrase "impaired property" to mean tangible property other than the insured's product that cannot be used or is less useful because (1) it incorporates the insured's product that is known or thought to be defective, deficient, inadequate or dangerous or (2) the insured failed to fulfill

the terms of a contract or agreement, *if* such property can be restored to use by (1) the repair, replacement, adjustment, or removal of the insured's product or (2) the insured fulfilling the terms of a contract or agreement. (Doc. # 21 at Exh. A).

In the present case, Allegheny's boiler house fits squarely within the definition of "impaired property." Indeed, the essence of Hartzell's argument is that the boiler house became less useful to Allegheny in the summer of 1995, because it incorporated Hartzell's fan, but that the boiler house could have regained its full usefulness if Hartzell's defective fan had been repaired or replaced. Allegheny's impaired property (i.e., its boiler house) also fits within the impaired property policy exclusion. Although its facility was not physically injured, Allegheny experienced property damage (i.e., a partial loss of use of its boiler house) arising from an alleged defect, deficiency, inadequacy or dangerous condition in Hartzell's fan, which disintegrated in November, 1994. As Hartzell itself candidly recognizes, these facts establish that Allegheny's losses fit under the "damage to impaired property" exclusion of the Federal policy. (*See* Doc. # 21 at 12).

Notably, however, the impaired property exclusion contains an exception, which renders the exclusion inapplicable "to the loss of use of other property [i.e., property other than Hartzell's fan] arising out of the sudden and accidental physical injury to [Hartzell's fan] . . . after it has been put to its intended use." Doc. # 21 at Exh. A.

Ohio's courts have seldom examined the "sudden and accidental physical injury" exception to the "impaired property" exclusion at issue herein. The Ohio Tenth District Court of Appeals did engage in a substantial discussion of the exclusion,

however, in *United Steel Fabricators, Inc. v. Fidelity Guaranty Ins. Underwriters, Inc.*, 1993 WL 69258 (1993). In that case, U.S. Steel had assembled expansion joints for the reconstruction of a bridge deck. After the joints were installed and the bridge opened for use, U.S. Steel's welds on the expansion joints cracked. As a result of the defective welds, U.S. Steel was sued. After Fidelity refused to defend or indemnity, U.S. Steel sought a declaratory judgment regarding the insurance company's obligations. In response, Fidelity relied in part on impaired property exclusion "m" in the insurance policy that it had issued to U.S. Steel.[17] As in the present case, however, the impaired property exclusion contained an exception which provided: "This exclusion does not apply to the loss of use of other property [i.e., property other than that of the insured] arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." Upon review, the Tenth District Court of Appeals held that the foregoing exception to the impaired property exclusion applied, reasoning:

This definition of impaired property and exclusion (m) seems to exclude insurance coverage for the consequential damage which occurred when Cianbro repaired the welds. The trial court determined that this exclusion would prevent insurance coverage for consequential damage in the absence of the exception to the exclusion which the trial court found to apply. Coverage, therefore, exists for the consequential damage. The exception to the exclusion, as quoted above, allows insurance coverage for the loss of use of other property arising out of sudden and accidental physical injury to the insured's

---

17. The definition of "impaired property" in the policy in *United Steel Fabricators* is virtually identical to the definition in the present case.

product after it has been put to its intended use. In other words, if the insured's product is put to use and then is suddenly and accidentally injured causing injury to other property, the injury to the other is within the coverage of the insurance policy. However, the initial injury must be sudden and accidental....

It is clear that USF's product had been put to its intended use when the cracks occurred. The trial court decided that the cracks occurred "suddenly," and cited *Buckeye Union Ins. Co. v. Liberty Solvents & Chemicals Co.* (1984), 17 Ohio App.3d 127, 477 N.E.2d 1227. In *Buckeye Union,* the Court of Appeals for Summit County interpreted an exception to an exclusion in an insurance contract which excluded coverage for damages caused by pollution unless the pollution was "sudden and accidental." The court interpreted "sudden and accidental" as meaning "unexpected or unintended" from the standpoint of the insured.

However, in a recent decision, the Ohio Supreme Court in *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096, rejected the Summit County Court of Appeals' analysis in Buckeye Union. The Supreme Court interpreted "sudden and accidental" and held that " 'sudden' in the exception is not synonymous with the word 'unexpected' in the typical definition of 'occurrence'; instead, the word has a temporal aspect." ... The Supreme Court stated that the *Buckeye Union* interpretation of "sudden" without a temporal aspect, did not allow "sudden" to add anything to the

phrase "sudden and accidental," since "accidental" in its ordinary use means unexpected and unintended, and the two words then have the same meaning. If given the same meaning, the word "sudden" would not serve a purpose in the phrase. The Court then cited *Wadsworth Coal Co. v. Silver Creek Mining & Ry. Co.* (1884), 40 Ohio St. 559, paragraph one of the syllabus, for the proposition that every word in a sentence should be construed to have meaning in the sentence.

Although the trial court in this case cited the disapproved *Buckeye Union* case, the trial court's actual interpretation given to the phrase "sudden and accidental" is not inconsistent with the Ohio Supreme Court's holding in *Hybud Equip., supra.* The trial court determined that, at the moment the cracks first appeared in the welds, the occurrence was "sudden." This interpretation does involve a temporal effect of the word "sudden." The trial court did acknowledge that "[t]he cracks may have developed in response to stresses occurring over time," (Decision, March 20, 1992, p. 6); however, the court concluded that the initial crack could have occurred in a sudden fashion. It was not the cracks but the cause of the cracks (and possibly the growth of the cracks) that occurred over time. This interpretation (that the cracks occurred suddenly) is a plausible conclusion based upon the allegations in Cianbro's Massachusetts complaint.

*Id.* at *3–4.[18]

■ Just as the cracks in *United Steel Fabricators* constituted a "sudden and accidental physical injury" to the insured's

---

**18.** *See also Riley Stoker Corp. v. Fidelity and Guaranty Ins. Underwriters, Inc.,* 26 F.3d 581, 589 (5th Cir.1994) (reasoning that a mechanical "breakdown" involving certain "ball tube mills" supplied by the plaintiff constituted a "sudden and accidental physical injury" to the plaintiff's product, within the meaning of a nearly identical "sudden and accidental physical injury" exception to an impaired property exclusion).

product (the expansion joints) which caused the "loss of use of other property" (the bridge), the November, 1994, snapping of the propellers in the present case constituted a "sudden and accidental physical injury" to Hartzell's product (its fan), thereby causing the loss of use of other property (Allegheny's boiler house).[19] As the Tenth District Court of Appeals recognized in *United Steel Fabricators*, the key phrase "sudden and accidental" includes both a temporal aspect (i.e., the physical injury to the insured's product must appear suddenly) and an element of surprise (i.e., the physical injury must be "unexpected or unintended" from the standpoint of the insured). In the present case, the uncontroverted evidence satisfies both requirements. Indeed, Federal does not dispute that the propellers on a Hartzell fan suddenly separated from the fan hub in November, 1994. Nor does Federal suggest that Hartzell intended or expected such an event to occur. To the contrary, as set forth more fully, *supra*, a trier of fact could only consider the catastrophic failure of Hartzell's fan to be an accident.[20] As a result, under Ohio law,[21] Allegheny's loss of use of its boiler house fits under the "sudden and accidental physical injury" exception to the impaired property exclusion.[22]

19. As set forth more fully, *supra*, Allegheny's boiler house became "less useful" as a result of the fan failure, which is sufficient to establish "property damage" under the terms of the Federal policy.

20. Parenthetically, the Court notes that its analysis herein and the analysis of the Ohio Tenth District Court of Appeals in *United Steel Fabricators*, regarding the "impaired property" exclusion and the exception thereto, are consistent with *Honeycomb Systems v. Admiral Ins. Co.*, 567 F.Supp. 1400 (D.Me.1983). In that case, the district court explained the exclusion and its exception as follows:

This exclusion distinguishes between a physical breakdown of the insured's product and a mere failure of the product to perform as well as warranted, presumably because the latter is a typical business risk whereas the former is more likely to have catastrophic consequences. One commentator illustrates the distinction as follows: "A boiler sold and installed by the insured in a manufacturing plant fails to heat a quantity of water to the specified temperature, and the plant's capacity is thereby reduced. There would be no coverage for the resulting loss. However, if the boiler suddenly and accidentally breaks down, or explodes, without causing physical damage to other property, the loss of use of the plant would be covered."
Defense Research Institute, Annotated Comprehensive General Liability Insurance Policy 50 (1979).
*Id.* at 1407.

The hypothetical example cited by the district court in *Honeycomb* supports this Court's conclusion that the exception to the "impaired property" exclusion applies in the present case. If Hartzell's fan simply had failed to work as well as was warranted (for example by failing to draw sufficient heat from the boiler house), then the impaired property exclusion would preclude coverage, even if the increased heat resulted in a loss of worker productivity. Given that Hartzell's fan propeller suddenly and accidentally disintegrated, however, the resulting loss of use of the boiler house is covered by virtue of the exception to the exclusion.

21. In support of its Motion for Summary Judgment, Federal contends that "[r]ulings in other jurisdictions support the application of the "Impaired Property" exclusion to the facts of this case." (Doc. # 23 at 32) (citing *Hamlin, Inc. v. Hartford Accident and Indemnity Co.*, 86 F.3d 93 (7th Cir.1996) (applying Wisconsin law)). Without respect to the accuracy of Federal's assertion, the insurance company fails to cite *any* Ohio case law contrary to this Court's analysis of the impaired property exclusion and exception or to the Tenth District Court of Appeals' analysis in *United Steel Fabricators*. As noted, *supra*, the present dispute is governed by Ohio insurance law, not the law of Wisconsin.

22. In light of the Court's determination that the policy exclusions asserted by Federal do not preclude Hartzell from obtaining indemnification, the Court need not address Hart-

■ Based on the foregoing analysis, the Court holds that any "loss of use" damages alleged in Allegheny's lawsuit against Hartzell are covered under the Federal insurance policy, and Hartzell is entitled to indemnification for such damages, *if* it paid any of them. Allegheny's second amended complaint against Hartzell reveals that the power company claimed "loss of use" damages of $50,000 for lost worker productivity in the summers of 1993 and 1995.[23] As noted, *supra*, however, Federal did not issue its insurance policy to Hartzell until 1994. Consequently, any damages for decreased worker productivity in the summer of 1993 would not be covered under the Federal policy. In any event, the Court notes that Federal contributed $50,000 toward Hartzell's settlement of Allegheny's lawsuit. (Doc. # 21 at Exh. K). As a result, even if *all* of Allegheny's damages for loss of worker productivity in 1993 and 1995 were covered under the insurance policy, Federal still would not be obligated to indemnify Hartzell for *any* of the $160,000 that Hartzell contributed toward the settlement (because Federal *already* has contributed an amount equal to all "loss of worker productivity" damages), unless some of the *other* damages alleged in Allegheny's complaint qualify as covered losses under the insurance policy.

As noted, *supra*, in addition to lost worker productivity, Allegheny alleged the following damages in its lawsuit against Hartzell:

1. $12,000 to retain an outside consultant to perform metallurgical and vibration reviews concerning the 1993 fan failure;

2. $281,000 in craft labor costs and engineering time from November, 1994, through August 1996, to repair, remove and replace fan components; and

3. $28,000 to retain an outside consultant "for review and testing for the aborted vibration strain gauge testing in July 1995."

(Doc. # 21 at Exh. E–3, ¶ 21, 61, 63).

It its not immediately apparent to the Court how or why any of the foregoing damages qualify as covered losses under the terms of the Federal policy.[24] In support of its Motion for Summary Judgment (Doc. # 21), Hartzell essentially assumes that if it establishes any covered "property damage," then it is automatically entitled to recover the $160,000 that it paid toward the settlement of Allegheny's lawsuit (minus only $15,647 for damage to the fan itself). On the other hand, in support of its cross Motion, Federal asserts, with no real analysis, that Hartzell cannot recover "consequential damages," because it cannot establish any covered "property damage" at all. (Doc. # 23 at 26).

As set forth more fully, *supra*, however, Hartzell *has* established covered "property

---

zell's argument that the insurance company waived its ability to assert those exclusions by not properly reserving its rights. (*See* Doc. # 21 at 14–15).

**23.** As set forth more fully, *supra*, Allegheny alleged that, as a result of increased heat attributable to Hartzell's defective fan, it suffered a loss of worker productivity in the summer of 1995. (Doc. # 21 at Exh. E–3, ¶ 63). Such an allegation is merely another way of saying that its facility was "less useful" due to the failure of Hartzell's fan. As a

result, Allegheny's damages for the loss of worker productivity reasonably may be characterized as "loss of use" damages.

**24.** Given that *some* portion of the $210,000 settlement with Allegheny is likely attributable to the $12,000 that the power company spent to retain an outside consultant to perform metallurgical and vibration reviews concerning the *1993* fan failure, Hartzell cannot obtain indemnification for that amount, as Federal did not issue its insurance policy until *1994*.

damage" (i.e., Allegheny's partial loss of use of its boiler house). That conclusion negates the premise underlying Federal's argument regarding Hartzell's ability to recover what it refers to as "consequential damages." Nevertheless, a reasonable argument can be made that if there is no coverage for the damage to Hartzell's fan itself (a point upon which the parties agree), then there is no coverage for any expenses incurred to repair or to replace the fan. With the exception of Allegheny's alleged "loss of use" damages, all of the damages at issue were incurred to determine the cause of the fan's failure and to repair or to replace it. As a general matter, such damages appear to be excluded from coverage under Ohio law. *See, e.g., Heile v. Herrmann*, 136 Ohio App.3d 351, 354, 736 N.E.2d 566, 568 (1999) (recognizing that commercial general liability policies typically "do not provide coverage where the damages claimed are the cost of correcting the work itself"). Given the parties' failure to provide any meaningful analysis of Hartzell's right to indemnification for Allegheny's damages, *other than* loss of worker productivity, the Court will overrule both Motions for Summary Judgment, without prejudice to renewal, insofar as they relate to such damages. Having reviewed the parties' respective Memoranda, the Court simply cannot say that either party has established its entitlement to judgment as a matter of law with respect to Hartzell's effort to obtain indemnification for $144,353 of the $160,000 that it contributed toward the settlement of Allegheny's lawsuit.

## III   Conclusion

Based on the reasoning and citation of authority set forth above, Hartzell's Motion for Summary Judgment (Doc. # 21) is sustained in part, and overruled in part without prejudice to renewal. The Motion is sustained, insofar as it relates to Hartzell's claim that the damages Allegheny Power sustained as a result of lost worker productivity in the summer of 1995 are covered under the commercial general liability insurance policy at issue. The Motion is overruled without prejudice to renewal, insofar as it relates to Hartzell's claim that it is entitled to indemnification for the other damages alleged by Allegheny Power in its lawsuit against Hartzell.

Federal's Motion for Summary Judgment (Doc. # 23) is overruled in part, and overruled in part without prejudice to renewal. The Motion is overruled, insofar as it relates to Federal's claim that the damages Allegheny Power sustained as a result of lost worker productivity in the summer of 1995 are not covered under the commercial general liability insurance policy at issue. The Motion is overruled without prejudice to renewal, insofar as it relates to Federal's claim that Hartzell is not entitled to indemnification for the other damages alleged by Allegheny Power in its lawsuit against Hartzell.

Counsel will take note that a telephone conference call has been scheduled for 8:30 a.m. on Friday, April 13, 2001, to set a trial date and to discuss the need for the filing of renewed motions for summary judgment.